**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC.,<br><br>    Plaintiffs,<br><br>- against -<br><br>PROSPERITY ALLIANCE, INC.,<br><br>    Defendant. | Adv. Pro. No. 24-_____(JTD) |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS
PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550
AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305**

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), West Realm Shires Services, Inc. ("WRSS" together with FTX, Alameda, WRS, and WRSS, the "Plaintiffs") through their undersigned counsel, for their Complaint against Prosperity Alliance, Inc. (the "Defendant"), allege the following based upon personal knowledge and upon their investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

{1368.003-W0078138.}

## NATURE OF THE CASE

1. Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from the Defendant, or from any other person or entity for whose benefit the transfers were made, all transfers of property of Plaintiffs to the Defendant, prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").

2. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128]. Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3. Plaintiffs have determined, based on their analysis and investigation to date, that the following transfers to the Defendant are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code:

| Dates | Amount of Transfer | Transferor |
|---|---|---|
| 05/12/2022 | $450,000.00 | Alameda |
| 05/16/2022 | $575,000.00 | Alameda |
| 05/18/2022 | $300,000.00 | Alameda |
| 06/07/2022 | $350,000.00 | Alameda |
| 07/21/2022 | $37,500.00 | Alameda |

4. During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made to or obligations incurred by Defendant that are avoidable under the Bankruptcy Code. Plaintiffs intend to avoid and recover all such transfers made to or obligations incurred by Plaintiffs to or for the benefit of Defendant or any other transferee and accordingly reserve the right to amend this Complaint. In particular, and without intending to create any limitation, Plaintiffs reserve the right to amend this Complaint to include: (i) further information regarding relevant transfers or obligations; (ii) information regarding additional transfers made or obligations incurred; (iii) additional plaintiffs; (iv) modifications of and/or revisions to the Defendant's name; (v) additional defendants; and (vi) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

**THE PARTIES**

5. Plaintiff FTX is a corporation registered in Antigua and Barbuda. Its principal place of business was in Nassau, Bahamas. FTX and its subsidiaries and affiliate entities collectively did business as FTX.com and operated a digital asset trading exchange. FTX is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly owned by Samuel Bankman-Fried ("Bankman-Fried").

6. Plaintiff Alameda is a British Virgin Islands company limited by shares. It is a wholly-owned subsidiary of Debtor Alameda Research LLC ("Alameda LLC"), a Delaware

limited liability company that is 90% owned by Bankman-Fried and 10% owned by Zixiao "Gary" Wang.

7. Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Nishad Singh, and 22.25% owned by other shareholders.

8. Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly owned subsidiary of Plaintiff WRS.

9. Defendant Prosperity Alliance, Inc. is a Virginia nonprofit corporation with its principal address of P.O. Box 80234, Washington, DC, 20018.

## OTHER RELEVANT PERSONS

10. Bankman-Fried is one of the founders of the FTX Group.[2] He co-founded Plaintiff Alameda in 2017 and served as its Chief Executive Officer through late 2021. During 2019, he founded FTX. In 2020, he established a separate group of operating entities that operated a digital asset exchange for U.S. persons, FTX US. At all relevant times, Bankman-Fried was the ultimate majority owner, and effectively controlled the operations, of Plaintiffs and their affiliated Debtors.

11. Nishad Singh was FTX's former Director of Engineering and held ownership stakes in various FTX Group companies.

12. Zixiao "Gary" Wang was a co-founder of FTX and its former Chief Technology Officer and held ownership stakes in various FTX Group companies.

---

[2] The "FTX Group" is comprised of four silos. These silos include: (a) a group composed of Debtor West Realm Shires, Inc., Debtor West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research Ltd., Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtors Clifton Bay Investments LLC, Clifton Bay Investments Ltd., Island Bay Ventures Inc. and FTX Ventures Ltd.; and (d) a group composed of Debtor and Plaintiff FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

13. Caroline Ellison was the co-CEO of Plaintiff Alameda LLC from August 2021 until September 2022, when she was named the sole CEO and director.

14. Each of Bankman-Fried, Singh, Wang, and Ellison was an "FTX Insider" and are together the "FTX Insiders."

15. Ryan Salame ("Salame") is the former chief executive officer of FTX Digital Markets Ltd.

16. Guarding Against Pandemics ("GAP") is a Delaware nonprofit corporation principally funded by Bankman-Fried with Debtors' assets. Bankman-Fried's brother, Gabe Bankman-Fried, was the Chief Executive Officer of GAP. The Debtors and GAP entered into that certain *Stipulation of Settlement Between the FTX Debtors and the GAP Entities* (the "GAP Settlement"), which was approved by the Court on October 28, 2024 by the *Order (A) Authorizing the Debtors to Enter into the Stipulation of Settlement with the GAP Entities, (B) Approving the Settlement, and (C) Granting Related Relief* [D.I. 27318]. Pursuant to the GAP Settlement, the FTX Debtors released GAP from any claims or causes of actions arising from or relating to the transfers of Debtors' assets described herein. Additionally, GAP transferred, assigned, conveyed, and delivered to the FTX Debtors all rights, title, ownership in, and/or interests (whether legal, beneficial, or otherwise) in any claim or cause of action against any recipient to which GAP transferred funds derived from such transfers, with full right to commence and maintain an action thereon in any court of competent jurisdiction. Accordingly, to the extent any of the transfers of Debtors' assets were later transferred by GAP, Plaintiffs are the proper party in interest to prosecute the above-captioned proceeding with respect to such transfers.

## JURISDICTION AND VENUE

17. This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates. Fed. R. Bankr. P. 7001(1).

18. This adversary proceeding arises from and relates to the Chapter 11 Cases filed with this Court on the Petition Date.

19. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

20. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

21. Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

22. The statutory predicates for the relief requested herein are Sections 105(a), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

23. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

I. **The FTX Insiders' Fraudulent Scheme.**

24. Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses. As explained in the First Day Declarations (defined below), the FTX Group

faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022. Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1] (the "Second Interim Report").

25.     The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.

26.     All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the transactions described herein. On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. *See* Min. Entry, Dec. 19, 2022, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). On September 24, Ellison was sentenced to two years in prison. *See* Min. Entry, Sept. 24, 2024, *United States v. Ellison*, 22-cr-

00673 (S.D.N.Y. 2022), ECF No. 19. Singh pleaded guilty to the same felonies and an additional charge of conspiracy to violate campaign finance laws, on February 28, 2023. *See* Min. Entry, Feb. 28, 2023, *United States v. Bankman Fried*, 22-cr-00673 (S.D.N.Y. 2022). On November 2, 2023 a jury found Bankman-Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including conspiracies to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.

27.   In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda and its affiliates "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies. Plea Tr. at 24:6-10, *United States v. Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21. Using these "special privileges," the FTX Insiders frequently caused FTX Group entities, including Plaintiffs, to misappropriate funds from the FTX exchanges for their own benefit, including to make speculative investments for which they overpaid, and political and charitable donations.

28.   Before his conviction, Bankman-Fried repeatedly, and publicly, claimed that Alameda LLC operated as "a wholly separate entity" from FTX.com. Annie Massa et al., *Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags 3 Months Before It Collapsed. Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/. Ellison was quoted as saying that "[w]e keep [FTX and Alameda] quite separate in terms of day to day operations." *Id*. In reality,

Alameda LLC routinely looted "several billion dollars" from FTX.com using its "special privileges," thereby defrauding FTX.com's creditors. Plea Tr. at 28:23-29:2, *United States v. Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102 ("Singh Plea Tr."); Plea Tr. 24:6-10, *United States v. Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

29.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" and that Alameda LLC was "borrowing" (*i.e.*, looting) billions of dollars from FTX.com in order to, among other things, finance sham "loans" from Alameda to the FTX Insiders. Ellison admitted to being aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral, . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id.* at 27:11-15.

30.     Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the fraudulent relationship between Alameda and FTX, and the scheme pursuant to which the FTX Insiders misappropriated customer funds. For example, Singh testified he and Wang implemented the "allow negative feature" which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit." *See, e.g.*, Trial Tr. at 1362:25-1363:10, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 16, 2023). When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main plan remains, making FTX successful and growing it." *Id.* at 1411:3-1412:10. FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it. The only thing we can do is grow the company and fill the hole." *Id.* at 1964:12-1965:5.

31. Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could get from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments in . . . relatively early-stage companies." *Id.* at 693:4-17. Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which "had been concealed from FTX's auditors." *Id.* at 937:12-14. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad." *Id.* at 786:13-25.

32. In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II. The FTX Insiders Defrauded Customers and Other Creditors of the FTX Group To Make "Political Contributions."

33. Bankman-Fried was aware at all relevant times of Alameda's special privileges on FTX's platform that had been encoded by Wang, and was aware that Alameda was borrowing billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to Bankman-Fried himself, or to make putative "donations" to causes favored by him—including to entities he controlled.

34. At the direction of Bankman-Fried, Ellison, Wang, and Singh, the FTX Group papered "loans" to FTX executives, including hundreds of millions of dollars earmarked for political contributions and speculative investments in other companies. Bankman-Fried directed Singh, Salame, as well as other FTX Insiders and FTX executives to make political donations

using Debtors' assets as straw donors to conceal the identity of the true donor, Bankman-Fried. The FECA, 52 U.S.C. § 30101 *et seq.*, prohibits people from making conduit contributions, *i.e.*, those "in the name of another person" or "knowingly permit[ing] [their] name to be used to effect such a contribution," *id.* § 30122, and prohibits corporations from making contributions, *id.* § 30118.

35. For example, by design of Bankman-Fried, Salame primarily made contributions to Republican candidates or Republican-affiliated PACs or super-PACs. Records identified by the Debtors show that Salame served as a conduit or "straw donor" for Bankman-Fried's donations to Republican Party candidates, which Bankman-Fried and Salame sought to obscure, and that Salame was rewarded for his participation in this scheme. Through this scheme, Salame made millions of dollars in political contributions in his own name to Republican Party candidates and causes as a straw donor to conceal the identity of the true donor, Bankman-Fried, in violation of campaign finance laws. *See, e.g.*, Bankman-Fried Trial Tr. at 1422:19-1423:3. Salame pled guilty to conspiracy to violate campaign finance laws. Salame stated at his plea hearing that the "tens of millions of dollars in campaign contributions" he made in his name were "funded by transfers from the bank accounts of an Alameda subsidiary." Plea Tr. at 21:19-23, *United States v. Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 283. He acknowledged that "[w]hile at the time these funds were categorized in both [his] and Alameda's ledgers as loans," he "understood then that the loans would eventually be forgiven and [he] never intended to repay them." *Id.* at 21:23-25, 22:1-5.

36. Singh also pleaded guilty to conspiracy to violate campaign finance laws. Singh testified at Bankman-Fried's criminal trial that he made "political donations" "in my name, using my bank account" using "funds deposited straight from Alameda." *See* Bankman-Fried Trial Tr

at 1420:19-25. Singh explained that "[f]unds would start out with Alameda at some bank account. They would get transferred into -- wired to my Prime Trust account, which is another bank account, and then Ryan [Salame] would request a wire withdrawal from my bank account to the campaign as a destination, and I would click OK in my email." *Id.* at 1430:3-7. Singh also testified that the "wires from Alameda" into his bank account used for the donations were coming from "[c]ustomers." *See id.* at 1433:15-25 ("There was an enormous hole, I knew, deficit in funds at FTX for customers, and Alameda sort of also had that hole. It was theirs to fill. Alameda sending me money to spend, as opposed to keeping money for customers, say, necessarily deepens that hole and is drawing on funds that would have otherwise gone to customers.").

37. The funds used to make these political contributions were often transferred from the same Alameda and North Dimension bank accounts to which FTX customers sent funds to be credited to their accounts on the FTX exchanges. *See* Second Interim Report at 24-25. The FTX Insiders then used these funds misappropriated from Alameda to make exorbitant political donations, ingratiating themselves and their affiliated companies with politicians and lobbyists, thereby furthering both their efforts to grow the FTX Group with minimal political oversight, and the FTX Group's image as a healthy, trustworthy, and successful group of companies. Indeed, at his criminal trial, Bankman-Fried admitted that "it would be good for FTX public relations to spend millions of dollars in donations each year." *See* Bankman-Fried Trial Tr. at 2642:21-2643:4. Singh, who pled guilty to violations of campaign finance laws by agreeing to make donations funded by Alameda, stated that he "did not select the candidates and the political action committees who received the donations" and that "the donations were in part for the benefit of Sam Bankman-Fried and FTX and their ability to be politically influential." Singh Plea Tr. at 33:7-14.

### III. Transfers of Debtors' Funds to Defendant.

38. According to its publicly available corporate and tax filings, Defendant is a Virginia non-profit corporation organized under 501(c)(4) of the Internal Revenue Code, for the purpose of "building a stronger economy for all Americans through enacting pro-growth economic policies." Upon information, belief, and review of publicly available filings, Defendant has primarily contributed funds to support Republican candidacies for state and/or federal elections and various conservative causes.

39. On April 26, 2022, Plaintiff Alameda transferred $13,000,000.00 from a Prime Trust account containing commingled customer assets held in its name to a Prime Trust account held in the name of Bankman-Fried. Bankman-Fried then transferred over the course of four separate dates a total of $1,675,000 from a Prime Trust account held in his name to Defendant, broken down as follows: (i) $450,000.00 on or about May 12, 2022 (the "May 12 Transfer"), (ii) $575,000.00 on or about May 16, 2022 (the "May 16 Transfer"), (iii) $300,000.00 on or about May 18, 2022 (the "May 18 Transfer"), and (iv) $350,000.00 on or about June 7, 2022 (the "June 7 Transfer").

40. On May 17, 2022, Plaintiff Alameda transferred $5,000,000.00 from a Silvergate Bank account containing commingled customer assets held in its name to a Signature Bank account held in the name of Bankman-Fried. On May 19, 2022, Bankman-Fried transferred $5,000,000.00 from a Signature Bank account held in his name to an Amalgamated Bank account held in the name of GAP. On July 21, 2022, GAP then transferred $37,500.00 from an Amalgamated Bank account held in its name to Defendant (the "July 21 Transfer" collectively with the transfers set forth in the immediately preceding paragraph, the "Transfers").

41. The Transfers to Defendant, which were funded by Debtors' assets containing commingled customer assets, were initiated by FTX Insiders via transfers from Debtor accounts

before being subsequently transferred to an account held by Defendant. The Transfers were neither investments nor was there any expected value or return to any of the Plaintiffs for the transfer of Plaintiffs' assets to Defendant. The Transfers from the Plaintiffs to Bankman-Fried then to Defendant were part of a single integrated transaction whereby funds that were property of the Debtors were transferred to Defendant.

42. The Transfers to Defendant were part of an integrated plan by the FTX Insiders to siphon money from FTX Group creditors and enhance their own personal reputations at the expense of creditors.

43. The Transfers were also part of a carefully coordinated and deliberate scheme by Bankman-Fried to violate federal campaign finance law through the use of "straw men" donors.

### B. The Transfers to Defendant Involved Multiple Badges of Fraud Evincing Actual Intent to Hinder, Delay, or Defraud Creditors.

44. As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the Transfers to Defendant, including that:

   i. Numerous material facts relating to the Transfers were concealed, including the source of the assets ultimately transferred to Defendant, the purpose of the Transfers, and the fraudulent scheme pursuant to which the Transfers were made;

   ii. Bankman-Fried and the FTX Insiders removed or concealed Plaintiffs' assets;

   iii. The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

   iv. Plaintiffs were insolvent when, or became insolvent shortly after, the Transfers were made; and

   v. The Transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(A)

45. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

46. Plaintiffs transferred their assets to Bankman-Fried who then (i) made the May 12 Transfer, the May 16 Transfer, the May 18 Transfer, and the June 7 Transfer set forth above at Paragraph 3 to Defendant and (ii) transferred Plaintiffs' assets to GAP, who subsequently made the July 21 Transfer set forth above at Paragraph 3 to Defendant.

47. Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

48. Each of the Transfers was made with the intent to hinder, delay, or defraud present or future creditors.

49. Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT TWO
### FRAUDULENT TRANSFERS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(B)

50. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

51. Plaintiffs transferred their assets to Bankman-Fried who then (i) made the May 12 Transfer, the May 16 Transfer, the May 18 Transfer, and the June 7 Transfer set forth above at Paragraph 3 to Defendant and (ii) transferred Plaintiffs' assets to GAP, who subsequently made the July 21 Transfer set forth above at Paragraph 3 to Defendant.

52. Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

53. Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

54. The Plaintiffs: (1) were insolvent on the date that each of the Transfers were made; (2) became insolvent as a result of these Transfers; (3) engaged or were about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, or believed that they would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.

55. Accordingly, each of the Transfers made by Plaintiffs to the Defendant should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT THREE
### FRAUDULENT TRANSFERS PURSUANT TO
### DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)

56. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

57. Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim. Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

58. Plaintiffs transferred their assets to Bankman-Fried who then (i) made the May 12 Transfer, the May 16 Transfer, the May 18 Transfer, and the June 7 Transfer set forth above at

Paragraph 3 to Defendant and (ii) transferred Plaintiffs' assets to GAP, who subsequently made the July 21 Transfer set forth above at Paragraph 3 to Defendant.

59. Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

60. Each of the Transfers to the Defendant was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.

61. Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)**

62. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

63. Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim. Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

64. Plaintiffs transferred their assets to Bankman-Fried who then (i) made the May 12 Transfer, the May 16 Transfer, the May 18 Transfer, and the June 7 Transfer set forth above at Paragraph 3 to Defendant and (ii) transferred Plaintiffs' assets to GAP, who subsequently made the July 21 Transfer set forth above at Paragraph 3 to Defendant.

65. Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

66. Plaintiffs did not receive reasonably equivalent value in exchange for any of these Transfers.

67. The Plaintiffs: (1) were insolvent on the date that each of the Transfers were made; (2) became insolvent as a result of the Transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.

68. Each of the Transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Transfers.

69. Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FIVE
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)

70. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

71. As alleged above, Plaintiffs are entitled to avoid each of the Transfers to the Defendant addressed herein under Sections 544 and 548 of the Bankruptcy Code.

72. Because the Defendant is the initial transferee, subsequent transferee or the entity for whose benefit such transfer was made, Plaintiffs may recover from the Defendant the full value of the Transfers pursuant to 11 U.S.C. § 550(a), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT SIX
## UNJUST ENRICHMENT

73. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 44 as if fully set forth here.

74. As a result of the Transfers to Defendant, Defendant was unjustly enriched by the receipt of the funds.

75. Any and all benefits obtained by Defendant as a consequence of the Transfers to Defendant were funded by Plaintiffs. However, Plaintiffs received no benefit in exchange for the Transfers.

76. Plaintiffs lack an adequate remedy at law against Defendant's unjust enrichment at Plaintiffs' expense.

77. Plaintiffs seek to recover from Defendant all payments received from Defendant made using money from Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

78. Enter an order that the Transfers addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

79. Award Plaintiffs under 11 U.S.C. § 550 no less than $1,712,500.00 (plus the value of any additional avoidable transfers that Plaintiff learns, through formal discovery or otherwise, were made to Defendant during the Avoidance Period);

80. Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

81. Award Plaintiffs all other relief, at law or equity, to which it may be entitled.

| | |
|---|---|
| Dated: November 8, 2024<br>Wilmington, Delaware | **LANDIS RATH & COBB LLP**<br><br>/s/ *Matthew B. McGuire*<br>Adam G. Landis (No. 3407)<br>Richard S. Cobb (No. 3157)<br>Matthew B. McGuire (No. 4366)<br>Howard W. Robertson IV (No. 6903)<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801<br>Telephone: (302) 467-4400<br>Facsimile: (302) 467-4450<br>E-mail:  landis@lrclaw.com<br>           cobb@lrclaw.com<br>           mcguire@lrclaw.com<br>           robertson@lrclaw.com |